Case number 18-1307, Nanua's, Inc. v. EDA, Nanua's Discounts, Court Petitioner v. Eugene Scalia, Secretary of Labor. Mr. Mooney, the Petitioner, Ms. Maltz, the Respondent. Mr. Mooney, the Petitioner, Ms. Maltz, the Respondent. Good morning.  Good morning, Your Honors. May it please the Court. My name is Daniel Mooney, arguing today on behalf of Petitioner, Manua's, Inc. And I'd like to reserve three minutes for rebuttal, if I might. Manua's was cited for multiple violations of OSHA's Cranes and Derricks and Construction Standard after a boom truck operated by Manua's crane contractor, which I'll call Apex today, made contact with a live power line, tragically killing three of Manua's employees. Now, we don't dispute that the accident on January 14, 2017, way down in the territory of American Samoa, involved multiple OSHA violations. And they all stemmed from the operation of a boom truck near an electrical hazard. But we ask the Court to carefully review today whether Manua's was chargeable for failing to address that electrical hazard, particularly on summary judgment, where it lacked the expertise to anticipate that hazard  In Sasser Manufacturing and Electric Company, the commission squarely addressed, quote, the extent of an employer's duty under the act, unquote, when an employer with no expertise in the subject matter of the work hires a specialty contractor who has such expertise. And the commission held that where that disparity in expertise exists, the  hazards within that specialist expertise, where that reliance is reasonable. So here the hallmarks of Sasser were clearly present. There was a stark disparity in expertise between Manua's and its contractor. Manua's was a retailer. Apex was a credentialed crane operator. How many employees of the petitioner were working on the crane? Approximately 12, Your Honor. Out of how many? Out of approximately 100. The petitioner has three retail stores and three warehouses in American Samoa, and about 100 employees at that time. No, no, no. Excuse me. I'm asking out of how many working on the crane. Oh, certainly, Your Honor. The record was ambiguous in that regard in terms of how many Apex employees showed up for the work. But we do know that there was a crane operator. There was a supervisor, which had worked with Manua's on prior projects. And there were at least, depending on who you believe at the deposition testimony, up to six other Apex employees. So the majority of employees were the employees of the petitioner who were working on the crane. Yes, in terms of numbers, yes. That's correct, Your Honor. But the record below was ambiguous as to what all of those employees were doing. Were they helping with the crane? It's very unclear from the record below. So the hallmarks of SASR are present here, and that includes that the boom truck's electrical hazard, which is the boom truck's proximity to a power line, was clearly and uniquely related to Apex expertise, not Manua's. So the commission was obligated to apply SASR to this case and then proceed to a full and fair analysis under the SASR and summary judgment standards of whether Manua's reliance on Apex was unreasonable as a matter of law. Instead, the commission's attention was diverted by cases imposing a heightened duty on a general contractor employer to affirmatively anticipate and ensure that its subcontractor will address the hazards at issue. And that makes sense because a general contractor, rather than a retailer, has the necessary skills to generally know what hazards exist on a construction project, or at least to know what questions to ask of its sub to ensure that those hazards are addressed. So what do you understand the commission to have said your client should have asked? What the commission said, Judge Roberts, that my client should have asked? Well, I think that the commission basically said, and bought into the Secretary's argument, that Manua simply did nothing to ensure its employees' safety. And that's a splashy argument, and it certainly provoked the ire of the ALJ and the commission. So what did the commission say your client should have asked? The commission didn't specify that. It simply cited the cases regarding general contractors for the propositions that Manua should have taken reasonable steps to address and ensure that the contractor addressed the hazards. But that's a meaningless inquiry because Manua, as a retailer, certainly didn't know what questions to ask. What about, I have 12 employees working on this job at your request. What safety precautions have you, to protect my employees? Certainly, Manua could have asked that question. Did the commission require it to ask anything more? It did, Your Honor. What more? I think the commission is requiring Manua to anticipate and guard against the cited hazard, which is an electrical hazard. And that hazard is something that Manua simply did not have the expertise to anticipate and guard against. Well, what I'm getting at, Manua is a business operation. It has some knowledge about how the world works. And one of the arguments you make is that it hired these people to work on electrical matters before. So when your Manua's employee says to the crane operator, Can you move and unload these steel bars closer to something? And the crane operator says, No, I can't do that because that would bring us too close to the electrical wire. So your client is on notice at that point, right? We've got a dangerous situation here if the crane operator moves. Certainly, Your Honor. And I'm glad that you picked up on that because the ALJ completely ignored that exchange, which I think is extremely relevant to the notice issue. So it cuts both ways, doesn't it? That's the interesting thing I thought about it. One, your client may not have any expertise, but it knew it was this dangerous wire in the working area. Certainly, Your Honor. But the distinction there is that that wire was a completely different electrical hazard than the one it issued. So when Manua's asked that question and got that information, it bolstered Manua's reliance on that contractor that they were aware of and were anticipating generally electrical hazards. It didn't put them on notice of the wire that actually caused the accident. And it certainly didn't give Manua's any information with which Manua's could then go and make its own assessment. That's why I asked you what is your understanding of what the commission required your client to ask. And you say it didn't say because it found your client didn't do anything. So you take that to mean your client would have to come up with a notebook of questions, tales about how this operator is going to function, et cetera. I don't see that in the commission's opinion anyway. Yeah, Your Honor. But where is that? But the commission didn't specify anything that Manua's could have done that would have actually meaningfully kept its employees safe. It said can't do nothing. Sure. And that's – I think that that language that the commission bought into is both legally misguided in light of Sasser, and it's factually incorrect. Is your argument primarily the contention that you should have been able to have more evidence and the summary judgment was improper? Certainly, Your Honor, yes. And what is our scope of review on this question? Your Honors are entitled to look at the commission's decision and determine whether those factual conclusions as a matter of law were supported by substantial evidence in the record. There is substantial evidence in the record that shows that Manua's took steps within its ability, its limited ability, as a retailer to keep its employees safe. It couldn't make – But with respect to the summary judgment question, which one of the commissioners sent it on, did the petitioner propose to introduce specific evidence to show the reason he relied on the contractor? Oh, absolutely, Your Honor. No, no. What specific evidence? What specific evidence? I didn't – I took – perhaps I misread the record, but I thought the petitioner wanted to show that how he had relied in the past on the contractor, but didn't indicate in what way the contractor was working and in what way the petitioner relied. Thank you for that question, Your Honor. The – Manua's had worked with Apex in the past, and in the record there is testimony that those projects that Apex performed for Manua's in the past included electrical work, and they included work with heavy equipment, such as an excavator. From the perspective of a layperson, one is reasonable in believing that someone who – Was this evidence in the record? Absolutely, Your Honor. So then – so why then is there a contention that you should have been entitled to produce further evidence? Because the evidence was ambiguous in terms of to what extent that work was done. You know, if – You could have put that evidence in, right? Certainly, and we did. And you did, and the question then is whether or not the substantial evidence in the whole record supports. I don't see that there's a big issue on whether summary judgment was appropriate. Well, Your Honor, the problem is, in addition to the – In other words, the agency may be right or wrong, but I don't see the procedural point here. Right. Because I don't see that there was any evidence that your client was prepared to introduce that wasn't a – they didn't have an opportunity to produce. Well, certainly, Your Honor, the commission both erred on the fact that it disregarded substantial evidence and it applied the wrong legal standard, which it's not entitled to deference on. This Court can sit and question that. That Court's application of cases like Favi, which deal with – deals with a general contractor, and cases like Blount. Well, it drew a distinction in Favi, didn't it? It applied the rule in Favi rather than the rule in Sasser. Excuse me. It distinguished Sasser. It – I mean, it's not – It paid lip service to Sasser. It's not as if the agency ignored the – they read them differently than you read them. That's correct, Your Honor. The – That's the point. Do we – that's where I'm concerned about our deference. The agency – Even if we conclude we would have decided differently, that doesn't mean we are allowed to reverse. The agency is bound to apply similar cases similarly. And that – if they don't, that is arbitrariness. That's caprice. They drew a distinction between those two cases. They did, but it was a distinction without a difference, Your Honor. So I don't understand that because – and I know you – I know you wanted to reserve time, but we usually give you time for rebuttal. Okay. Up to the presiding judge, obviously. Here's what I don't understand about the notion that it's an arbitrary distinction, which is what Sasser was about, and I'm reading from Sasser, there's no evidence that anyone realized that the operator might swing the boom too close to the power lines. Because what happened there was it was kind of this momentary thing. The boom got swung. Nobody thought that it could get within 10 feet, but then for some reason the operator swung it in the way that it got within 10 feet on the spur of the moment. Correct. But that's a spur of the moment type of thing. This case, part of what the commission is saying here and part of the distinction drawn in Favi was that these two cases are not spur of the moment type of things. Because, for example, demarcating a zone. Demarcating a zone, which is one of the violations, that's not something that happens on the spur of the moment. That can happen substantially in advance. So it's just a different kind of concern that was at issue in Sasser. That was a spur of the moment swing of the boom that nobody could have foreseen. Whereas here, the failure to demarcate the zone is something that everybody can foresee. Certainly. In Favi, the court found that because the employer was a general contractor, it had reason by way of, and I think this is a quote, expertise, control, and time to anticipate that hazard. Here and in Sasser, the time that the work was performed only gave Minua's reason to believe that the work was performed safely. It was performed safely over an entire day of operation, a previous day, when nothing happened and there were no citations from OSHA. But there still wasn't a zone demarcated. Certainly. But how does Minua's know, without the expertise to do so, what the maximum working radius of that crane is in order to demarcate a work zone? Only Apex had that expertise. Well, you can ask the question of whether it was even done. I mean, it doesn't – it seems quite different to have a demarcating boundaries issue, which is something that doesn't occur on the spur of the moment and something that occurs on the spur of the moment, as to which there can't be any reasonable foreseeability because nobody foresaw it. Certainly. Anybody can foresee whether there's a boundary demarked. The other similarity I would draw between this case and Sasser that I think the Commission completely ignored is that it was a spur-of-the-moment accident. Even the OSHA inspector found, just like in Sasser, when the crane was swinging one way and unexpectedly swung the other way and made contact, the OSHA inspector found that the entire duration of the work on the day of the accident involved the crane boom not being fully extended. So that no layperson, without knowing what the specifications of that crane were, could extend to – With identifying the work zone, that's just by definition. That's not a spur-of-the-moment thing. Unless – does the work zone shift during the project on a minute-to-minute basis? Absolutely. It does. On each work site, the work zone is defined by the maximum working radius of the crane. Right, but it doesn't – it's not like something that fluctuates. It's not like the work zone at 3.02 is 75 feet, and then the work zone, because of the way the crane swings at 3.02 and 30 seconds, is 47 feet. Unless I'm – am I wrong about that? No, I think that's right. If the boom truck remains in the same place, stationary, the work zone would be the same. But my point is that Manuas could not be reasonably expected to make that determination or to even know what the work zone should have been. It doesn't have to be demarcated with flags. It just has to be established. But isn't it reasonable to expect him to inquire about that? No, because he doesn't know that – He's got 12 employees. If he can look out and see – And in an inherently dangerous situation. No, because he's never operated a crane before. He doesn't know what that crane's working radius is, and so without – and there aren't physical, visual demarcators every time in a work zone delineation. The crane contractor has to do that, just has to establish what that is based on that maximum work radius. Well, it still seems to me to be indisputable. And you might think it might be indisputable, but that doesn't matter as a legal matter. But it seems to me to be indisputable that there's a distinction between coming within 10 feet on the spur of the moment and demarcating a work zone, in that demarcating a work zone is something that can be done in advance. Coming within 10 feet, the way that the commission construed what happened in Sasser, is something unexpected that happened on the spur of the moment. Demarcating a work zone is not something unexpected that happens on the spur of the moment. It's just something that you have to do in advance. But it's – Isn't that just a fair – isn't what I've described an actual distinction? Now, you might think as a matter of law that distinction shouldn't matter, but it just seems to me it's a physical fact about the world that what I just described is a real distinction. Sure, Your Honor. It's not a spur of the moment thing, but it did have to happen on the morning of that accident. And Mnoua's did not have, within its experience, time to go to – or the knowledge to go to Sasser or to go to Apex and say, give me the technical details of this crane. Tell me the maximum working radius. Right. So we can all – It's a question of how the commission – how to read Sasser, and more to the point, how the commission should have been compelled to read Sasser. Because if you think that what Sasser means is, if there's a disparity in expertise, then the employer just gets to siphon off everything to the contractor. If that's the way to read Sasser, then right. I mean, your argument has more force. But if the way to read Sasser is what the commission was concerned with was unforeseeable spur-of-the-moment dangers that come about, then what the commission did this time wouldn't be out of sorts with Sasser because it would be in keeping with Sasser and drawing that very distinction. Yeah, and we're not even arguing that because of that disparity in expertise, you can just siphon off everything. You still have to be reasonable. You still have to not have evidence that would have given a lay employer notice of that particular hazard. We're arguing that that reasonableness was here. That notice was not present. And at least for purposes of summary judgment, that determination couldn't be made for this matter of law. So let me ask you a question about the summary judgment aspect of this. This may not be your argument, but I almost read it to say that if Sasser were to come before the commission today, it wouldn't come out the way it did, or at least the majority wouldn't. It would go with the dissent, which describes a very different picture of the factual situation that the majority relied on. So here, is it clear from the record that while the contract was general, but the obligation of the crane was to move these steel bars out of the containers and put them on the ground, that there was no anticipation that the crane operator would move the bars anywhere near 20 feet of this dangerous wire, and that the inspector, the OSHA inspector, couldn't figure out how this happened. And in thinking about this case, I thought, I wonder how it did happen. Did the operator lose control, or was he trying to meet your client's preference to have these steel bars deposited on the ground closer to the area so that your client wouldn't have to transport them this far? I don't know. And the record doesn't tell us. And that's what I'm trying to understand about this case. If the zone was clearly from A to B, and the dangerous crane is at point C, then why isn't this a spur-of-the-moment situation in terms of even the OSHA inspector can't figure out what happened. But he does cite your client for these four violations. Would you agree? We're not challenging that you didn't violate those. We're not challenging that there were violations. And I do think that the record does make clear that it's unclear why this accident happened the way it did. There's nothing in the record that would support that the reason that boom extended at the last moment and touched the power line was because of where Manua's directed APEX to put the beams. APEX, by all testimony in the record, was simply just putting them the way that they could, for convenience or whatever. But the question about putting the beams closer to the construction site was the day before, the prior day of unloading. And as soon as APEX said, no, we can't do that safely because of this other power hazard, Manua's backed off. They said, okay, you're the boss, you're the expert, we won't do that because that's unsafe, you told us. So that's not the reason why these beams are being placed closer to the power lines. Does that answer your question, Your Honor? All right, I'm quite a ways over my time, so thank you. Good morning, may it please the Court. I'm Susanna Waltz for the respondent secretary of labor. We're here today because Manua's failed to ensure the safety of its warehouse and maintenance employees when it sent them to participate in a dangerous construction operation. Could you speak a little louder, ma'am? I can't hear you. As a result, three employees were killed and a fourth was seriously injured. The only issue before the Court today is whether the commission was within its discretion when awarding summary judgment to the secretary, where the undisputed evidence establishes that Manua's employees were exposed to the cited violations while assisting in dangerous construction work and Manua's reliance on APEX to ensure its employees' safety was unreasonable. Turning to the issue of reasonable reliance, under the OSH Act, an employer is responsible for the safety of its employees. What Manua's did in this case was plainly inadequate to satisfy its duties under the Act. It sent its own employees to do construction work, though it knew the work was dangerous and it knew that its employees were not qualified. It didn't discuss safety with APEX at all. Nothing in Sasser or any other case law permits an employer to do what Manua did. Can I suggest something for you, counsel? Yes. We discourage lawyers to argue before us, to read their argument. Yes. And it's also hard to hear. I apologize. Don't I suggest that you just speak extemporaneously? You must know the case. I do, yes. Go ahead. Thank you, Your Honor. Sasser does not permit an employer to simply send its employees into a dangerous work site without doing anything to ensure their safety. So what do you think the commission is requiring an employer? I think this Court need not reach the issue of what would have been reasonable here under these circumstances, because here Manua didn't do anything at all in order to... Well, Manua argues it did some things, and the commission says not enough, and the commission says, well, look at all these other cases. Manua comes back and says, but look at Sasser. And so you heard the discussion Judge Schmiede-Bossen had with counsel. Yes. Sasser differs from this case on several other factual distinctions in addition to the spur-of-the-moment issue. Well, the commission found four distinctions. All right? The question is substantial evidence in the record to support, even though Manua can point to evidence that goes the other way. I'm afraid I don't understand the question. You don't understand whether the four distinctions that the commission made are supported by substantial evidence in the record, even though there's evidence pointing the other way? I do understand that those are supported by substantial evidence in the record, and the distinctions between this case and Sasser are supported by the undisputed record. It's undisputed that Manua sent 12 of its employees into a dangerous work site. It's undisputed that they- It's undisputed that the contractor asked Manua to have its employees assist it in carrying out the contract. Yes, to the extent that Apex arrived and asked for a construction and told them that they needed a construction. What I'm getting at is we're in summary judgment, and the non-moving party gets the benefit of favorable inferences. So I'm trying to get you to focus on substantial evidence here to support the commission's findings, and we're talking principally about Sasser and the distinctions between Sasser. And the fact there was evidence in the record that Manua is arguing should have entitled it to some favorable inferences. It doesn't argue the case this way, but that's the implication of its brief, and therefore summary judgment was inappropriate. I disagree that summary judgment was inappropriate. Apex arrived and told Manua that it needed a construction crew, and at that point Manua has agreed to send its own untrained, unqualified employees to do construction work. Well, they were to what? Exactly. They were to rig- Unload the bars. They were to rig the 40-foot steel beams to the crane and then unrig them. And that means what? That means they changed the beams. They climbed into the shipping containers. And it's steel chains. I believe so, yes. Well, I mean, you've got to be clear. I mean, that's not rocket science. No, but it's still dangerous construction work. Yes. And they were still retail employees. They were warehouse and maintenance employees. Their jobs were to mow the lawn and to sweep the warehouse and to stack boxes. Well, presumably these were sturdy guys, strong guys, who could move these chains around. And then they left when the crane pulled the bars out and put them on the ground. They left the shipping containers? I'm sorry, I think I misunderstood the last thing that you said. I'm trying to understand, and Judge Silberman was exploring this with counsel, the nature of summary judgment. Yes. For various reasons, Minua takes issue with the distinctions in SASA. And on summary judgment, as a non-moving party, why isn't it entitled to some of these inferences it's arguing here? Why is the commission's finding conclusive? It is entitled to those inferences under summary judgment. But even with those inferences, the record shows that Minua did not reasonably rely on APEX, and it sent its own unqualified employees into a dangerous construction site without doing anything to ensure their safety whatsoever. And SASA does not hold that that's appropriate. Well, Minua says it did tell its employees to wear the safety equipment that it required. And somebody told them, be careful, or something like that. It did not discuss safety with the contractor at all. It didn't tell the contractor that the contractor would be responsible for those employees' safety. It didn't ask about safety issues at all. Merely telling your employees to be careful when they go into a dangerous construction site is something other than delegating office responsibility. So at a minimum, the contract should have said something explicit about whose responsibility it was to ensure the safety of any of Minua's employees who were working on the job? I think that that would have made it more reasonable, Your Honor. You know, I think that's at least an agreement with APEX  You don't really mean to say that the petitioner could have avoided all liability by simply contracting with APEX. No, but I think that a clear agreement between APEX and Minua is about who was responsible for safety. Your basic position, if I understand it, is with 12 employees working for APEX in circumstances which even a retail man may see presented some risk. It was incumbent upon the petitioner to question the contractor as to what he would do to protect. And certainly, simply signing a contract whereby the contractor would have all responsibility would not, if I understood your commission's determination, would not have excused the petitioner. No, but I believe that it would have certainly been a step in the right direction. No, but this is critical, it seems to me, what Judge Silberman is asking you. To delegate OSHAC responsibility to the other party alone, without doing anything else, I don't think would be enough, no. You have to, as I understand your position, is that the petitioner should have asked questions concerning in what way its employees would be protected against rather obvious hazards. My position is that the petitioner should have at least asked questions and made clear which party was responsible. Is that the same thing I just said? It is, it's at least, it's at least, it would require at least that much. That's what I took to be the opinion of the commission. Yes, in that case we agree. In other words, for summary judgment purposes, what matters is if there is a genuine issue of material fact. Yes. And what you're saying is the things that Manuas has pointed to aren't material fact, aren't material, given the way the commission assessed the case and the way you're defending the commission's assessment of the case. That's right, and I would also say that some of them aren't factual disputes at all. They're just disagreements with legal conclusions. They're what? Speak up. I'm sorry. They're disagreements with legal conclusions. I can offer an example from their brief. They argue that the prior experience with Apex should have, that the judge ignored it and it should have been considered, but that information is in the record and the judge actually mentions it in the decision. They merely disagree with the judge's legal conclusion that the relevant prior experience with Apex would have been prior crane work, as it was in Sasser. Well, they say involving electrical and moving heavy equipment. Yes, and the judge considered that but found that what would have been relevant to reasonable reliance was prior crane work, specific crane work experience with the contractor. So to the extent that they argue that those facts were ignored, they weren't ignored. Not only were they not ignored, they're in the decision. To me, the commission says this at the end of its decision. Indeed, in Sasser, there was no violation of the cited standard until seconds before the crane's contact with the power line because prior to that moment, the contract was in compliance with the standard and in effect, which required that the maximum extension of the boom be no less than 10 feet away from the power lines. And then to contrast it with this case, here there were several violations of the cranes and derricks and construction standard from the moment the unloading work began, such as a failure to identify the work zone and then to determine if the boom could get closer than 20 feet and to demarcate the 20-foot boundary. So the main distinction the commission was relying on, as I understand it, is that in Sasser, there was nothing that happened until the moment that there was a boom swing. Whereas here, there were all kinds of things that happened way before that, and there was no effort made by Manuas to raise any inquiries about any of that. And it could have been reasonably expected to have done all of that, notwithstanding anything that was said in Sasser because Sasser was about a situation in which there was, quote, no violation of the cited standard until seconds before the crane's contact. Yes, I agree. I do think that that is a distinction that the commission drew and that there are other additional factual distinctions that brought this case even further from Sasser. But do you think this distinction is not enough or do you – you don't read the commission to think that this distinction is enough? I do read the commission to think this distinction is enough. To think this distinction is enough. And in addition, there were other distinctions that make this case wholly different from Sasser. Moving on, I guess Manuas incorrectly argues that the Secretary's position in this case would require it or any employer to become an expert in the specialty work that a specialty contractor does that is not the Secretary's position. An employer can rely on specialty contractors to perform work with a crew of specialty workers, with the contractor's own workers. But where they've lent their own employees to this operation – to a different employer, a specialty contractor or otherwise, they need to take adequate steps to ensure those responsibilities. I see that I'm very close to being over time. Thank you. Thank you. Counsel for Petitioner. Your Honor, just briefly, the Secretary continues to argue that Manuas did nothing and that that determination by the commission was sufficient under its obligations to follow precedent that looks exactly like this case and apply the summary judgment standard. And again, that's a splashy argument that makes Manuas look bad. But I think it's legally misguided and it's just factually incorrect. We have cited numerous facts in our briefing that show Manuas did take reasonable steps as a retailer, within its limited experience as a retailer, and Your Honor pointed out some of them, to make sure that its employees were able to safely perform the limited task that its specialty contractor asked them to perform, to tie the beams. Now, the Secretary says that – Counsel, you're arguing in this case as if we were the Occupational Safety and Health Review Commission rather than the Court of Appeals reviewing a decision of the commission. Well, I think that's because the court, this court, has the same authority to apply and analyze legal precedent and whether the commission applied like precedent to this like case. Yes, but as Judge Srinivasan said and as I implied earlier, there was enough of a distinction between Fave and Sasser for the agency to reasonably draw a distinction, not necessarily one I would have drawn, but reasonably draw one. And once that's done, where are you without an argument based on Fave and Sasser? Well, Your Honor, I don't think that the distinction drawn by the commission was reasonably supportive. Let me repeat my question. Where are you without that distinction? Where am I without that distinction? Yes. Where is your case without that distinction, without talking about those two cases? Let's suppose this is Ab initio, a new case. Certainly, Your Honor. I think we're back to trial to show the steps that Manuas did take and to prove to the judge that those steps were reasonable under the circumstances. But why isn't it, under our limited scope of review, why isn't it incumbent upon us to determine that the agency's decision was at least reasonable? Because the court... It was based on evidence, substantial evidence. Because I don't think the substantial evidence exists to support the commission's determination that Sasser did not squarely apply in this case. Your Honor, counsel, I ask you to put aside Sasser and Fave for a moment because I agree with my colleague that there is a distinction between those two cases. But put aside those two cases. Let's assume this case came up in Ab initio. What is your argument as to why the commission is wrong to the point that we should reverse? Because the commission failed to analyze the record as a whole and to determine that Manuas' reliance on its specialty contractor was unreasonable. In what way have they failed to analyze the record as a whole? Because they omitted complete and very important key facts that we did put in the record. They said that Manuas specified no specific facts to rebut the secretary's position. That's just not the case. The commission stuck its head in the sand in terms of a lot of the things, a lot of the testimony down below at the ALJ level. So we would just argue, and we pointed these out in our briefs, the electrical hazard assessment that Manuas witnessed Apex make, which put it on notice only that Apex was looking out for the employees, was looking out for hazards, was taking responsibility and control over the safety of the work site. How can we reverse OSHA's determination that the petitioner did not do an adequate job in inquiring as to what the contractor would do to protect its employees? Because of this Court's rule that it is required to apply like cases. Oh, now you're back to, but I do think. Well, our case does depend on Sasser, Your Honor. Your case totally depends on the proposition that Sasser governs. Absolutely, Your Honor. That's your case. If we disagree with you, you lose your case on that ground. I think that Sasser sets out precedent, and it's longstanding precedent. I don't think that the commission adequately and fairly distinguished Sasser under the circumstances. If I might, the judge. Why isn't that? That's an arbitrary and capricious question, right? It is, yes. Typically, when the argument's made that administrative determination is out of step with prior administrative determinations, it's not a substantial evidence question. It's an arbitrary and capricious question. Right. I think both standards are applicable here, but in terms of application of Sasser standard or not to this case, this Court has said, the commission's dissimilar treatment of evidently identical cases seems the quintessence of arbitrariness and capricious. There's no question. So it is. There's no question about that. So it really comes down to that's your fundamental argument. Certainly. Our fundamental argument is that Sasser controls and should have been fairly applied to this case because all the material facts fall under Sasser, and any distinctions that the commission made were immaterial and distinctions without a difference, Your Honors. All right. Sorry, go ahead. We have your argument. We'll take the case under advisement. Thank you, Counsel. Thank you, Your Honors.
judges: Rogers, Srinivasan, Silberman